BARBARA BRACKEN

CIVIL ACTION NO.

VERSUS

20-72-SDD-EWD

DOUG WELBORN, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS
CLERK OF COURT FOR EAST BATON
ROUGE PARISH

## RULING

This matter is before the Court on the *Motion for Summary Judgment*[1] by Defendant, Doug Welborn, sued in both his individual and official capacities as Clerk of Court for East Baton Rouge Parish ("Defendant").  Plaintiff, Barbara Bracken ("Plaintiff") has filed an *Opposition*[2] to this motion, to which Defendant filed a *Reply*.[3]  For the following reasons, the Court finds that Defendant's motion should be granted.

Unless otherwise indicated, set forth below are facts deemed admitted for purposes of this Motion based on Plaintiff's failure to comply with Local Rules 56(c) & (f) of the Middle District of Louisiana.  Where Plaintiff failed to cite to record evidence in denying Defendant's statements or submitted argument rather than a supported factual statement, the Defendant's proffered statements of fact are deemed admitted as not properly controverted under the Local Rules of Court.  Further, the Court will not consider

---

[1] Rec. Doc. No. 27.
[2] Rec. Doc. No. 29.
[3] Rec. Doc. No. 35.

"statements of fact" offered by Plaintiff that mischaracterize or clearly contradict the record citation offered in support. Further, hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[4]

## I. FACTUAL BACKGROUND

### A. Plaintiff's Employment with Defendant and Allegations of Sexual Harassment

Plaintiff was hired in November 2012 as a deputy clerk in the Mortgage Department of the Clerk of Court for the Parish of East Baton Rouge at the downtown branch.[5] Greg Brown ("Brown") is currently and has been the Chief Deputy Clerk of Court since October 2009; he is number two in command, working directly under the Clerk of Court, and he had supervisory authority over Plaintiff for the duration of her employment with Defendant.[6] Brown and Plaintiff knew each other socially prior to Plaintiff's employment with Defendant.[7] In October 2012, Plaintiff saw Brown at Walmart and advised that she was looking for a job, and Brown told Plaintiff to apply with the Clerk's office.[8]

Soon after, Plaintiff interviewed and became employed as a deputy clerk in the Mortgage Department where she worked in the City Hall building under the direct supervision of Howard Burgess ("Burgess").[9] Plaintiff claims that, shortly after her employment began with Defendant, Brown began sexually harassing her. Plaintiff contends that, on her second day of work, Brown called the Mortgage Department and

---

[4] *Shields v. Boys Town Louisiana, Inc.*, 194 F.Supp.3d 512, 523 (E.D. La. 2016)(citing *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir.1987); Fed. R.Civ. P. 56(c)(2)).
[5] Rec. Doc. No. 27-2, Bracken Depo. at 22; 491-492.
[6] Rec. Doc. No. 27-3, Brown Depo. at 71; Rec. Doc. No. 27-2, Bracken Depo. at 439, 492.
[7] Rec. Doc. No. 27-2, Bracken Depo. at 40-47; Rec. Doc. No. 27-3, Brown Depo. at 6, 10.
[8] *Id.* at 63, 139-142; Rec. Doc. No. 27-3, Brown Depo. at 124.
[9] *Id.* at 143-146.

told Plaintiff's co-worker Imogene Scott ("Scott") that he wanted "only" Plaintiff to give him a ride home.[10]    Plaintiff's actual testimony does not include the word "only."    Plaintiff testified that Brown would come to the Mortgage Department and sit in a chair "with his legs open on that stool knowing that we have to come out for lunch, and he'd sit there and look at you.    Never said anything to me."[11]    Plaintiff felt this was sexual and intimidating.[12]    Brown admitted calling Plaintiff into his office on, "at most," three occasions,[13] but denied that he ever made any comments of a sexual nature to her.[14] Plaintiff testified that she believed Brown called her in his office to "look [her] up and down;"[15] "My opinion says he called me in there to look at me, to keep me – to look me up and down.    That's my opinion on it."[16]    Plaintiff also contends Brown discussed his prior sexual encounters with her and told her "I like looking at you when you walking out. You know, I like looking at you out my window when you were walking. I like the way you walk, you know," which Plaintiff interpreted as sexual advances.[17]    Plaintiff claims that, during these meetings, Brown would talk about his family, how he made six figures, and that he "talked about his sexual encounter(s) with other women, including that he 'slept' with a former School Board Member."[18]    Plaintiff cites the deposition testimony of Brown wherein he acknowledges discussing this School Board Member with Plaintiff; however,

---

[10] Rec. Doc. No. 29-1, p. 21 (citing Rec. Doc. No. 29-3, Bracken Depo. at 169-173.  Plaintiff cites Ex. 24 to her deposition, but this Exhibit does not appear in Rec. Doc. No. 29-3; exhibits to Plaintiff's deposition skip from 22 to 27.
[11] Rec. Doc. No. 29-3, Bracken Depo. at 204:2-5.
[12] *Id.* at 203-204.
[13] Rec. Doc. No. 29-3, Brown Depo. at 66-67.
[14] *Id.* at 66.
[15] Rec. Doc. No. 29-3, Bracken Depo. at 176.
[16] *Id.*
[17] *Id.* at 441-442.
[18] Rec. Doc. No. 29-1, p. 21.  Plaintiff offers no record citation for this statement.  Plaintiff's counsel is cautioned that, on this argument, the brief is an unsupported and overzealous embellishment which invites Rule 11 inquiry.

Brown denied discussing any sexual encounters with Plaintiff and expressly denied that he told Plaintiff that he had ever "slept with" this particular person.[19] During one encounter in 2013, Plaintiff contends Brown made a sexual demand in asking her to give him a "hug."[20]

Plaintiff contends she reported Brown's alleged sexual harassment to Burgess, her direct supervisor, in accordance with the Clerk's policy;[21] yet, no action was ever taken to remedy the situation. Plaintiff contends that all disciplinary action taken against her, as will be set forth below, was in retaliation for rejecting Brown's sexual advances and reporting his alleged behavior to Defendant.

Burgess became ill and retired in 2015.[22] Jeff Hickerson ("Hickerson"), who is employed by Defendant as the Clerk of Court Land Records Administrator, and who directly oversees the supervisor of the Mortgage Department, oversaw and supervised the Mortgage Department while Burgess was out sick.[23] Plaintiff contends that Scott was the "acting supervisor" for the Mortgage Department when Burgess was out because she was the senior employee in the department and assumed some of the responsibilities that had been Burgess' job duties.[24] Although Hickerson acknowledged that Scott was "overseeing things" as the "most senior person" in the department at the time,[25] he also testified that "she wasn't a supervisor,"[26] and would not agree that she was an "acting supervisor," stating:

---

[19] Rec. Doc. No. 29-3, Brown Depo. at 68.
[20] Rec. Doc. No. 29-3, Bracken Depo. at 185.
[21] *Id*. at 481-483.
[22] Rec. Doc. No. 27-5, Wells Depo. Vol. 2 at 47.
[23] Rec. Doc. No. 27-4, Hickerson Depo. at 7-8, 16, 18; Rec. Doc. No. 27-5, Wells Depo. at 88.
[24] Rec. Doc. No. 29-3, Bracken Depo. at 214-221, 480-481; Rec. Doc. No. 29-2, Hickerson Depo. at 74-80, 85-88.
[25] Rec. Doc. No. 29-2, Hickerson Depo. at 76.
[26] *Id*.

> Well, I said she was – she wasn't acting. She didn't have a title. She was just kind of assuming some of the responsibility, but she was not a supervisor nor an acting supervisor. She was just kind of assuming the role to make sure the department was, you know, flowing as it should.[27]

Burgess was ultimately replaced by Denise Becnel Jagneaux ("Jagneaux") in the role of supervisor of the downtown Mortgage Department.[28]

Plaintiff was provided a copy of the Clerk's Handbook containing Defendant's employment policies at the beginning of her employment with Defendant and on various occasions throughout.[29] The Handbook sets forth the Clerk's Equal Opportunity policy as follows:

### 3.5 Equal Employment Opportunity

> The Clerk's Office is an Equal Employment Opportunity Employer which does not discriminate based on race, color, religion, gender, age, sexual orientation, pregnancy, national origin, disability, military status, marital status, or any other legally protected status. . . .

> If you believe this policy has been violated, you must report the incident to the Human Resources Department immediately. If you believe that an employee within the Human Resources Department has violated this policy, you must report the incident to the Chief Deputy immediately.[30]

The Clerk's policy for defining, prohibiting, and reporting discrimination, harassment, retaliation in the workplace is set forth as follows:

### 3.8 Discrimination, Harassment and Retaliation

> The Clerk of Court is committed to treating all employees equally and to providing a positive working environment free of any form of discrimination, harassment or retaliation. . . .

---

[27] *Id.* at 85:9-14.
[28] Rec. Doc. No. 27-2, Bracken Depo. at 235-236. Plaintiff "denies" this statement of fact although she testified to it (Rec. Doc. No. 29-1, p. 3); *see also* Rec. Doc. No. 27-3, Brown Depo. at 76-77; Rec. Doc. No. 27-4, Hickerson Depo. at 41; Rec. Doc. No. 27-5, Wells Depo. at 76; Rec. Doc. No. 27-6, Plunkett Depo. at 101-102.
[29] Rec. Doc. No. 27-2, Bracken Depo. at 153-154; Rec. Doc. No. 27-7.
[30] *Id.* at 154-163, Ex. G (EEO Policy).

Every employee is equally responsible for implementing this policy and the state and federal laws prohibiting discrimination, harassment and retaliation based upon race, color, religion, gender, age, national origin, sexual orientation, marital status, disability, military status, pregnancy status or any other legally protected status.

Discrimination, harassment and retaliation will not be tolderated by the Clerk's office. Any employee who engages in discrimination, harassment or retaliation in violation of federal and state law or of the Clerk's policy will be subject to discipline, including but not limited to reprimand, suspension without pay or termination.

\* \* \*

**Retaliation** is an adverse consequence to an employee including suspension, demotion, dismissal or disparate treatment. Retaliation against an individual for reporting or participating in an investigation of a claim of harassment or discrimination is a violation of state and federal law. Retaliation, like harassment or discrimination, is a serious violation of this policy which will result in disciplinary action up to and including termination.

**REPORTING INCIDENTS OF DISCRIMINATION, HARASSMENT OR RETALIATION**
Incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position must be reported to the reporting employee's immediate supervisor, the department administrator or the Human Resources Department immediately. If the employee, for whatever reason feels uncomfortable reporting the incident to his or her immediate supervisor, the department administrator and the Human Resources Department, the employee must report the incident to the Chief Deputy.[31]

The Handbook contained a policy outlining the Clerk's expectations for employee's standard of conduct.[32] The Handbook contained a progressive discipline policy[33] and a policy on how employees should handle difficult situations.[34] Plaintiff testified that, at the beginning of her employment, Brown informed her that she was expected to have "good customer service" and "to treat the employees well, and . . . treat the customers well."[35]

---

[31] *Id.*, Ex. G (Retaliation policy).
[32] *Id.*, Ex. G (Standards of Conduct Policy, p. P-DISCOVERY-RESPONSES-000220)(Rules of Conduct policy, p. PDISCOVERY- RESPONSES-000221).
[33] *Id.*, Ex. G (Infraction and Violations policy, p. P-DISCOVERY-RESPONSES-000224).
[34] *Id.*, Ex. G (Dealing with Difficult Situations policy, p. P-DISCOVERY-RESPONSES-000225).
[35] *Id.* at 155. Plaintiff inexplicably denies this fact. Rec. Doc. No. 29-1, p. 4.

## B. Work Disputes and Initial Disciplinary Action – April 2015

In April 2015, Plaintiff had disagreements with Karen Lands ("Lands"), a co-worker in the Mortgage Department.[36]   Defendant contends Plaintiff made a comment about needing help at the front counter, which Lands overheard and believed was directed at her, and Lands "reacted negatively," began to cry, and reported the incident.[37]   Plaintiff testified that Lands was complaining about Plaintiff's tone of voice during the incident.[38]   Hickerson concluded that Plaintiff was mostly in the wrong in causing the disputes with Lands.[39]

Plaintiff received her first formal discipline on April 23, 2015, for "voicing departmental issues/problems out loud instead of talking to the supervisor or administrator."[40]   Hickerson testified that Plaintiff "has a way about how she says something, and it's not always pleasant. . . that's what we dealt with on a pretty regular basis with Ms. Bracken."[41]   Hickerson testified that, although Scott was performing some supervisory duties in the Mortgage Department, she was the wrong person for Plaintiff to approach with departmental complaints.[42]   Plaintiff submitted a written rebuttal to the counseling report.[43]   Human Resources Manager Melanie Wells ("Wells") ultimately signed and agreed with the counseling report.[44]

Plaintiff disputes Defendant's account of what transpired between herself and

---

[36] Rec. Doc. No. 27-4, Hickerson Depo. at 32-33, 48, 63; Rec. Doc. No. 27-5, Wells Depo. at 75.  Plaintiff's "denial" does not counter this fact.
[37] Rec. Doc. No. 27-2, Bracken Depo. at 207, 216.
[38] *Id.* at 207-208; Rec. Doc. No. 27-4, Hickerson Depo. at 75.
[39] Rec. Doc. No. 27-4, Hickerson Depo. at 33, 48-49. Plaintiff's "denial" does not counter this fact.
[40] Rec. Doc. No. 27-2, Bracken Depo. at 214-215; Rec. Doc. No. 27-4, Hickerson Depo. at 74, 78-80; Rec. Doc. No. 27-5, Wells Depo. at 79-81, 92; Rec. Doc. No. 27-9.
[41] Rec. Doc. No. 27-4, Hickerson Depo. at 91.
[42] *Id.* at 84-86.
[43] Rec. Doc. No. 27-2, Bracken Depo. at 216; Rec. Doc. No. 27-9.  Plaintiff inexplicably "denies" this fact.
[44] Rec. Doc. No. 27-5, Wells Depo. at 84, 90.

Lands in April 2015.  Plaintiff believes the reprimand was unfounded because she did not raise her voice or speak directly to Lands.[45]  Plaintiff acknowledged that Hickerson advised her to go to him with department complaints rather than Scott.[46]  Plaintiff maintains that her 2017 satisfactory performance review undermines Hickerson's assertion that she had a bad attitude or problem with her tone of voice in performing her work duties.[47]  Plaintiff also claims that there are no documents demonstrating that Hickerson gave her verbal counseling regarding her attitude although she claims this is "required by the Clerk's own policy."[48]

Defendant counters that Plaintiff's 2017 performance review does include a comment that Plaintiff needs to improve her "communication and cohesiveness with coworkers and supervisors."[49] As Hickerson explained, this language was "a nice way of saying that [she] needed to work on [her] attitude."[50]  Further, although Plaintiff claims this comment on her evaluation was not written at the time she was given the performance review,[51]  Defendant points to Plaintiff's testimony that "Hickerson told [Jagneaux] to write that while I was in the office with her."[52]

### C.  Continuing Work Issues and Disciplinary Actions – 2015-2017

Issues between Plaintiff and Lands continued into late 2015.  In November 2015, Wells met with the employees of the Mortgage Department, including Plaintiff, Lands,

---

[45] Rec. Doc. No. 29-3 at 188-189, Bracken Depo., Ex. 6.
[46] *Id.* at 189.
[47] *Id.* at 190-191, Bracken Depo., Ex. 9.
[48] Rec. Doc. No. 29-1, p. 4 (citing Rec. Doc. No. 29-2, Hickerson Depo. at 49-52).
[49] Rec. Doc. No. 27-33 at 4.
[50] Rec. Doc. No. 35-1, Hickerson Depo. at 54.
[51] Rec. Doc. No. 29-3, Bracken Depo. at 237-239.
[52] Rec. Doc. No. 27-2, Bracken Depo. at 239:1-5.

Nancy Brummel ("Brummel"), and Pam Areceneaux ("Arceneaux").[53]  Employees reported in these interviews that Plaintiff "talked down" to Lands, murmured under her voice at Lands, and was "mean."[54]  Plaintiff told Wells that Lands "need[ed] to do more."[55] Wells met with Hickerson to discuss the problems between Plaintiff and Lands and indicated to Wells that the disagreement between them was "ongoing."[56]

In 2016 and 2017, Jagneaux, who was Plaintiff's direct supervisor, had conferences with Plaintiff "about her attitude," because she was "argumentative with other employees and [Ms. Jagneaux] to the point of being very upsetting and disruptive."[57] Jagneaux brought the issues to Hickerson and expressed her frustration in dealing with Plaintiff.[58]  Hickerson testified that he had "many conversations" and undocumented verbal counselings with Plaintiff regarding her attitude, negativity, rudeness, tone and her conflict with coworkers; in response, Plaintiff would "talk over" him and "always denied that she was a problem" or that "she did anything."[59]

On August 18, 2017, Plaintiff was issued another written corrective action.[60]  This incident involved Lands accusing Plaintiff of not wanting to help her and talking to her with the "wrong tone."  Plaintiff "threw her hands in the air," to indicate "I can't do anything else."[61]  Hickerson felt this was "another one of those rude situations where [Plaintiff]

---

[53] Rec. Doc. No. 27-5, Wells Depo. at 125-127, 138-139, 141, 147, 150-154; Rec. Doc. No. 27-10; Rec. Doc. No. 27-11.  Plaintiff's "denial" does not counter this fact.
[54] Id. at 147, 152-153, VOL. 2, pp. 28-36, 37-38, 40-41; Rec. Doc. No. 27-10; Rec. Doc. No. 27-11. Plaintiff's "denial" does not counter this fact.
[55] Id. at 150-151, 153-154.  Plaintiff's "denial" does not counter this fact.
[56] Rec. Doc. No. 27-5, Wells Depo. at 143.
[57] Rec. Doc. No. 27-12.
[58] Rec. Doc. No. 27-4, Hickerson Depo. at 42, 44-46, 50, 52, 158, 188.
[59] Id. at 38-39, 43-44, 46-50, 72, 90, 107-108, 127-128, 187-188, 228.
[60] Rec. Doc. No. 27-2, Bracken Depo. at 241-244; Rec. Doc. No. 27-4, Hickerson Depo. at 112-114; Rec. Doc. No. 27-13.
[61] Id. at 226-227, 242; Rec. Doc. No. 27-4, Hickerson Depo. at 105, 108, 119.

voiced out loud after being asked numerous times not to behave in that manner;" corrective action was warranted because of her "outburst," "rude manner," "negativity in front of everybody," and "what she said and how she said it."[62]  Hickerson issued this corrective action on his own without consulting Brown.[63]

Both Plaintiff and Lands were provided corrective actions for the incident and advised that "this constant behavior" would not be tolerated, and they needed "to find a way to communicate or risk suspension or termination."[64]  Although both employees were issued corrective actions, Hickerson did not find that Lands was at fault;[65] rather, he determined Plaintiff was at fault after interviewing other employees and considering the statement submitted by Arceneaux.[66]  Hickerson then met with Plaintiff, advising her they were there because of her tone and further stating, "why do we keep coming here concerning your tone?"[67]  Plaintiff admitted in her deposition that she had a "loud tone" that "people get intimidated by."[68]  Plaintiff testified that she told Hickerson essentially that this is the way she is, she could not change, and she "cannot sound like a white girl."[69] Wells testified that Plaintiff told her: ""This is who I am. I can't change. This is who I am."[70] Plaintiff believed the August 18, 2017 corrective action to be ""unwarranted" and "falsely written,"[71] and she submitted a written rebuttal expressing her beliefs.[72]

---

[62] Rec. Doc. No. 27-4, Hickerson Depo. at 105-107, 109, 118.
[63] *Id.* at 136; Rec. Doc. No. 27-3, Brown Depo. at 204-205.
[64] *Id.* at 114, 120-121; Rec. Doc. No. 27-15; Rec. Doc. No. 27-2, Bracken Depo. at 243; Rec. Doc. No. 27-13.
[65] *Id.* at 133-135.
[66] *Id.* at 137-143, 169-170, 220-221, 223, 225-227; Rec. Doc. No. 27-5, Wells Depo. at 125.
[67] Rec. Doc. No. 27-2, Bracken Depo. at 249.
[68] *Id.* at 227; Rec. Doc. No. 27-14.  Plaintiff "denies" her own testimony, arguing she "did not have issues with her tone of voice."  Rec. Doc. No. 29-1, p. 8.
[69] *Id.* at 265-266.
[70] Rec. Doc. No. 27-5, Wells Depo. at 106.
[71] Rec. Doc. No. 27-2, Bracken Depo. at 246-247; Rec. Doc. No. 27-4, Hickerson Depo. at 128.
[72] *Id.* at 254, 256; Rec. Doc. No. 27-5, Wells Depo. at 109-110; Rec. Doc. No. 27-16.

Plaintiff paints a different picture of the events described above occurring between November 2015 through August of 2017. First, Plaintiff contends that Arceneaux defended Plaintiff in one of the incidents involving Lands; yet, she was still reprimanded.[73] In response to every statement offered by Defendant regarding Plaintiff's poor attitude and negative tone in dealing with co-workers, Plaintiff counters with her performance evaluations identifying her as a "hard worker" and "good employee;" her work was "excellent," and there were no "problems with her job performance."[74] Further, Plaintiff cites the declaration of co-worker Shirley Dupre ("Dupre"), who described Plaintiff as professional, cooperative, a dedicated worker, and someone who performed her job exceptionally well.[75] Plaintiff further contends that the lack of documentation for Hickerson's alleged verbal counselings with Plaintiff regarding her tone and her satisfactory performance evaluations undermine Hickerson's credibility regarding Plaintiff's attitude.[76] Plaintiff also claims Hickerson told her that he did not want to write her up in 2017, but was directed to do so by Brown,[77] which Plaintiff believes evidences retaliatory motive on the part of Brown. Further, Plaintiff contends Lands was not issued a corrective action for the incident; rather, her report was merely Hickerson's account of the incident, and Lands was not disciplined.[78]

Defendant acknowledges that Arceneaux emailed Hickerson on August 15, 2017 regarding the 2017 dispute between Plaintiff and Lands and communicated that Plaintiff was not in the wrong in this incident; however, Hickerson testified that, while he took

---

[73] Rec. Doc. No. 29-3 at 203, Ex. 14 to Bracken Depo.
[74] Rec. Doc. No. 29-4, Plunkett Depo. at 33; Rec. Doc. No. 29-2, Hickerson Depo. at 31-32.
[75] Rec. Doc. No. 29-2 at 228, Dupre Declaration.
[76] Rec. Doc. No. 29-2, Hickerson Depo. at 49-52.
[77] Rec. Doc. No. 29-3, Bracken Depo. at 248.
[78] Rec. Doc. No. 29-3, Wells Depo. at 113-118; Rec. Doc. No. 29-2, Hickerson Depo., Exs. 69, 70.

Arceneaux's email into account, it was contradicted by other witness accounts, and Hickerson ultimately decided to issue the corrective action to Plaintiff.[79]

Regarding Plaintiff's 2017 satisfactory performance evaluation and insistence that she did not have a bad work attitude or tone of voice issue, Defendant claims Plaintiff's characterizations of Hickerson's and Pamela Plunkett's evaluations of her performance are incorrect. While Hickerson testified that Plaintiff's "work was good," "she seemed dedicated to the work," and she was a "good worker," he also testified that she had "personality issues" because she had a "difficult personality," an "attitude," and she was "confrontational" with Lands.[80] Hickerson characterized Plaintiff as "rude" and as having "outburst[s]" and "negativity in front of everybody," meaning "it is what she says and how she says it."[81] Further, Hickerson testified that Plaintiff created an intimidating work environment in the Mortgage Department because the way she talked to people "[was] not always pleasant."[82] Plaintiff's subsequent supervisor Plunkett did, indeed, testify that Plaintiff was a "very hard worker" and her "work was excellent;"[83] however, Plunkett also testified that, at some point, Plaintiff's attitude towards her changed, and Plaintiff was rude, making snide remarks and inappropriate comments.[84]

Defendant denies the sentiment expressed by Dupre that Plaintif was "professional, cooperative, [a] dedicated worker, and performed her job exceptionally well," noting that Dupre was a Clerk of Court employee who did not work in the same department as Plaintiff and did not supervise Plaintiff. To the contrary, Plaintiff's

---

[79] Rec. Doc. No. 27-4, Hickerson Depo. at 137, 139-141.
[80] *Id.* at 32, 103.
[81] *Id.* at 47, 105-106.
[82] *Id.* at 187.
[83] Rec. Doc. No. 27-6, Plunkett Depo. at 33.
[84] *Id.* at 44-48, 57.

supervisors— Hickerson, Jagneaux, Plunkett, Kahne Cupit ("Cupit") and Brandon Abadie ("Abadie") —did not share this opinion of Plaintiff.[85]

Further, Defendant notes that both Jagneaux and Hickerson testified that Jagneaux was present for several conferences with Plaintiff regarding her attitude.[86] Defendant posits that Plaintiff's denial of this fact is apparently based on her misassumption and speculation that Jagneaux had not signed the statement attributable to her because Plaintiff believed that she would have signed her name as "Denise Becnel," her maiden name.[87] However, Jagneaux submitted a declaration verifying this was her statement and it was true and correct.[88]

Defendant rebuts Plaintiff's claim that Hickerson was directed by Brown to issue the August 18 2017 corrective action with Hickerson's testimony wherein he expressly denies this assertion.[89] Defendant also admits that the correction action issued to Lands was merely a report of the incident and not discipline.[90]

### D.  September 2017 Transfer to Airline Office

On September 15, 2017, the supervisors of the Mortgage Department met with Brown and Wells to further discuss Plaintiff.[91] Wells drafted a summary of the meeting[92] wherein the decision was made to transfer Plaintiff to the Mortgage Department located

---

[85] Rec. Doc. No. 27-3, Brown Depo. at 79, 81, 97-98, 106-107, 126-127, 204-205; Rec. Doc. No. 35-1, Hickerson Depo. at 31-32, 84, 103, 136, 156, 183; Rec. Doc. No. 35-2, Wells Depo. at 163, 173; Rec. Doc. No. 35-3, Plunkett Depo. at 33, 146-147, 149, 158-159, 162-163, 171, 187; Rec. Doc. No. 27-22, Abadie Declaration, ¶¶ 5-6; Rec. Doc. Nos. 27-9, 27-12, 27-13, & 27-19.
[86] Doc. No. 27-4, Hickerson Depo. at 38-39, 41-47, 50- 52, 94, 122; Rec. Doc. No. 27-12, Jagneaux Declaration.
[87] Rec. Doc. No. 27-2, Bracken Depo. at 236.
[88] Rec. Doc. No. 27-12, Jagneaux Declaration.
[89] Rec. Doc. No. 35-1, Hickerson Depo. at 83-84, 136, 156.
[90] *Id.* at 133-135.
[91] Rec. Doc. No. 27-3, Brown Depo. at 203; Rec. Doc. No. 27-4, Hickerson Depo. at 159-160, 167-168, 188; Rec. Doc. No. 27-5, Wells Depo. at 155-157, 165-167.
[92] Rec. Doc. No. 27-5, Wells Depo. at 156; Rec. Doc. No. 27-17.

at the Clerk's Airline Highway office.[93] Brown and Wells felt that a transfer would provide Plaintiff with another chance and a "fresh start."[94] Hickerson agreed with the transfer and thought it would be a "good move" because Plaintiff would have a private office, "quiet space" to concentrate, and she would "not have to deal with coworkers so much."[95] Her supervisors did not consider Plaintiff's transfer to the Airline office as discipline.[96] Plaintiff switched job locations with Clerk's employee Reagan Callendar ("Callendar").[97]

Plaintiff was informed of the transfer on September 15th and began working at the Airline office the same day.[98] Plaintiff testified that she understood that she was being sent to work at the Airline office because she was having problems working downtown.[99] At the Clerk's Airline Branch Office, Plaintiff was supervised by the Administrator of the Airline office, Brandon Abadie, and two co-supervisors, Pamela Plunkett and Kahne Cupit.[100] Defendant contends that, at the time of her transfer, the supervisors at the Airline office did not know about Plaintiff's write ups, issues and/or conflicts at the Downtown office.[101]

Plaintiff's job duties changed at the Airline branch. Sheriff sales are not performed at the Airline Branch office; thus, instead of performing expropriations or sheriff's sales as she had done at the Downtown office, Plaintiff focused on cancellations and liens at the

---

[93] Rec. Doc. No. 27-3, Brown Depo. at 83; Rec. Doc. No. 27-4, Hickerson Depo. at 194; Rec. Doc. No. 27-5, Wells Depo. at 155, 167, 168.
[94] *Id*. at 83, 92, 135;
[95] Rec. Doc. No. 27-4, Hickerson Depo. at 65-66, 68, 70-71, 159-160, 170, 171.
[96] Rec. Doc. No. 27-5, Wells Depo. at 94.
[97] Rec. Doc. No. 27-4, Hickerson Depo. at 66-68, 159, 166; Rec. Doc. No. 27-5, Wells Depo. at 167.
[98] Rec. Doc. No. 27-2, Bracken Depo. at 269; Rec. Doc. No. 27-4, Hickerson Depo. at 173, 178-179.
[99] *Id*. at 281-282; Rec. Doc. No. 27-18.
[100] Rec. Doc. No. 27-3, Brown Depo. at 93; Rec. Doc. No. 27-4, Hickerson Depo. at 36-37; Rec. Doc. No. 27-6, Plunkett Depo. at 10-11.
[101] Rec. Doc. No. 27-6, Plunkett Depo. at 15-16.

Airline office.[102]  Plaintiff testified that she was "very happy" and came to "love" working at the Airline office; she liked having her own private office, helping customers, and not being bothered.[103]

Plaintiff contends this transfer was involuntary and was in retaliation for reporting the prior sexual harassment by Brown.  Plaintiff claims Hickerson told her that he and Glen Fortune ("Fortune"), Training Director, had to "fight for [Ms. Bracken] to stay at [her] job" and that they did not know "why Mr. Brown hated" her.[104]  Plaintiff also claims that, a few days before she was involuntarily transferred, Fortune met with her and "prayed for her."[105]  Plaintiff cites the deposition testimony of Wells to support her claim that the decision to transfer her was made solely by Brown.[106]  However, while Wells testified that the first she heard about Plaintiff's transfer was from Brown, she also testified, in the portion cited by Plaintiff, that Brown advised her that Fortune recommended the transfer.[107]

Plaintiff testified that Brown told her in this meeting that she would not have been transferred if she had "[done] what [he] said."[108]  Plaintiff argues that "doing what he said" meant comply with his sexual advances,[109] but this assertion appears nowhere in her testimony regarding this incident.  Plaintiff also contends that she was stripped of job duties and her work hours changed.[110]  Plaintiff contends she was never told that she was

---

[102] Rec. Doc. No. 27-2, Bracken Depo. at 270-271, 456, 458, 463, 495; Rec. Doc. No. 27-3, Brown Depo. at 81-82, 91-92; Rec. Doc. No. 27-4, Hickerson Depo. at 163-166; Rec. Doc. No. 27-5, Wells Depo. at 176-178.
[103] *Id.* at 274-277; Rec. Doc. No. 27-4, Hickerson Depo. at 179, 190.
[104] Rec. Doc. No. 29-3, Bracken Depo. at 259-61, 469-470.
[105] *Id.*
[106] Rec. Doc. No. 29-3, Wells Depo. at 155-157; 169.
[107] *Id.* at 169.
[108] Rec. Doc. No. 29-3, Bracken Depo. at 262.
[109] Rec. Doc. No. 29-1, p. 10.
[110] Rec. Doc. No. 29-3, Bracken Depo. at 463-465.

being transferred because of her work performance issues but, rather, because Callendar was having work performance issues.[111]   Plaintiff claims that, contrary to Defendant's assertion otherwise, Wells disclosed Plaintiff's disciplinary history to Abadie in October 2017.[112]  Plaintiff apparently denies that anyone supervised her at the Airline branch other than Brown.[113]

In response, Defendant notes that Hickerson and Fortune both deny ever telling Plaintiff that Brown "hated her" or that they had to "fight for [her] to stay at her job."[114] Brown denied ever making the statement that he hated Plaintiff.[115]  Defendant denies that Brown solely made the decision to transfer Plaintiff and cites multiple sources of evidence that Fortune first raised the transfer as an option.[116]  Indeed, Plaintiff admitted that Fortune was "part of the team that put [the transfer] together."[117]  Defendant also contends Plaintiff has mischaracterized her own testimony in stating that Brown told her she would not have been transferred if she had "'[done] what [he] said' [complied with his sexual advances]." Defendant quotes Plaintiff's actual testimony on this: "Barbara, if you would have did what I said, we wouldn't have to bring Denise from across the street."[118]   Defendant argues that the context of this testimony reveals that Plaintiff took this to mean that she would have been made the supervisor, a position she never asked or applied for, and

---

[111] Rec. Doc. No. 29-2, Hickerson Depo. at 65-68; Rec. Doc. No. 29-3, Wells Depo. at 167-168; Rec. Doc. No. 29-3, Bracken Depo. at 283; Rec. Doc. No. 29-4, Plunkett Depo. at 42-44, 111-112.
[112] Rec. Doc. No. 35-2, Wells Depo. at 180-185.
[113] Rec. Doc. No. 29-1, p. 11 (citing Rec. Doc. No. 29-3, Brown Depo. at 71-72).
[114] Rec. Doc. No. 35-1, Hickerson Depo. at 182-183; Rec. Doc. No. 35-2, Wells Depo. at 161; Rec. Doc. No. 35-5, Fortune Declaration.
[115] Rec. Doc. No. 29-3, Brown Depo. at 147.
[116] *Id.* at 135; Rec. Doc. No. 35-1, Hickerson Depo. at 166; Rec. Doc. No. 35-2, Wells Depo. at 169; Rec. Doc. No. 35-5.
[117] Rec. Doc. No. 29-3, Bracken Depo. at 261.
[118] *Id.* at 262-263.

presumably did not want.[119]

Defendant also challenges Plaintiff's contention that there was no mention of her attitude, antagonistic tone, or unprofessional conduct at the transfer meeting, citing Wells' notes from the meeting discussion.[120]  Further, the email sent by Plaintiff regarding this meeting undermines her claim:  "I was scolded by Mr. Brown regarding my alleged conduct with my coworker, Ms. Lands and then I was told by Mr. Brown that I was being transferred to the Airline office."[121]  Defendant admits that Plaintiff's work hours and job duties were changed following the transfer.  Finally, Defendant acknowledges that, as the Chief Deputy Clerk of Court, Brown remained general supervisor over all employees of the Clerk of Court; however, he was not Plaintiff's day-to-day supervisor and did not know about the corrective actions issued by her direct supervisors.[122]

### E.  October 2018 Corrective Action and Suspension

In October 2018, Plunkett observed that Plaintiff had begun to treat her differently, made "snide remarks," acted "rude," and "talk[ed] bad . . . or talk[ed] down to" her."[123] Other employees at the Airline branch had also complained to Plunkett about Plaintiff being rude.[124]  Plunkett spoke with her co-supervisor Cupit about Plaintiff; Cupit stated, "If I were you, I would not take that from her."[125]  Thus, Plunkett complained to the Airline Administrator, Brandon Abadie.[126]  Plunkett was verbally disciplined by Abadie for using

---

[119] *Id.*
[120] Rec. Doc. No. 27-17.
[121] Rec. Doc. No. 27-18.
[122] Rec. Doc. No. 27-2, Bracken Depo. at 492; Rec. Doc. No. 27-3, Brown Depo. at 71, 107, 126-127, 135, 152-154, 204-205.
[123] Rec. Doc. No. 27-6, Plunkett Depo. at 41-42, 44, 46-49, 154-155.
[124] *Id.* at 55-59.
[125] *Id.* at 55, 61.
[126] *Id.*

a curse word when speaking with Plaintiff.[127]

Plaintiff was issued a disciplinary action on October 24, 2018 for her interaction with Plunkett.[128] Plaintiff felt that Plunkett did not properly greet her, so she approached Plunkett's doorway and made a "smart remark" to the effect that the "old women have to help the young women" learn to say good morning.[129] Plunkett complained to Abadie that she was "tired and couldn't do it anymore."[130] Plunkett agreed with the disciplinary action given to Plaintiff.[131]

Abadie made the decision to write up Plaintiff on his own, without consulting Brown.[132] Abadie told Plaintiff that the reason for the corrective action and her suspension was because five employees had complained to him about her rudeness, she had a "tone" when talking to a coworker about a phone call, and she displayed a bad attitude when asked to train a coworker.[133] In accordance with the Clerk's progressive discipline policy, and because this was not her first corrective action, Abadie decided to suspend Plaintiff.[134] Plaintiff was suspended for one week without pay,[135] from October 24, 2018 through November 1, 2018; thereafter she took a one-week vacation from November 2, 2018 through November 7, 2018. She returned to work on November 8, 2012.[136]

---

[127] *Id.* at 89-90.
[128] Rec. Doc. No. 27-19.
[129] *Id.*; Rec. Doc. No. 27-2, Bracken Depo. at 291, 298-299, 445; Rec. Doc. No. 27-5, Wells Depo. at 186-187; Rec. Doc. No. 27-6, Plunkett Depo. at 45-46, 151-152.
[130] Rec. Doc. No. 27-6, Plunkett Depo. at 54, 158, 169.
[131] *Id.* at 108, 213-214.
[132] Rec. Doc. No. 27-22, Abadie Declaration, ¶ 5; Rec. Doc. No. 27-6, Plunkett Depo. at 149, 158-159, 162-163, 171.
[133] Rec. Doc. No. 27-2, Bracken Depo. at 297-299, 310, 437, 445-447; Rec. Doc. No. 27-5, Wells Depo. at 132-133, Vol. 2 pp. 18-21; Rec. Doc. No. 27-6, Plunkett Depo. at 99-100, 102, 214-216.
[134] Rec. Doc. No. 27-22, Abadie Declaration, ¶ 6; Rec. Doc. No. 27-6, Plunkett Depo. at 187.
[135] Rec. Doc. No. 27-2, Bracken Depo. at 447, 484; Rec. Doc. No. 27-3, Brown Depo. at 107-108; Rec. Doc. No. 27-5, Wells Depo. at 180-181.
[136] *Id.* at 313, 450-452; Rec. Doc. No. 27-3, Brown Depo. at 101, 109-111; Rec. Doc. No. 27-5, Wells Depo. at 216-217, Vol. 2 p. 59; Rec. Doc. No. 27-20.

Plaintiff felt the corrective action and suspension were "unjust," "unfair," not truthful and an attack on her character.[137] During her suspension, Plaintiff wrote rebuttal letters.[138] Wells considered Plaintiff's rebuttal but ultimately stood by the suspension.[139]

Plaintiff generally denies the veracity of Defendant's version of the events that led to the October 2018 corrective action; however, she often fails to cite supporting record evidence for her assertions of fact, or she cites record evidence that does not support her assertion. Plaintiff contends she did not say to Plunkett that "the young ones have to teach the old people some manners," rather, Plaintiff claims she said in a joking manner that "the older women have to help the younger women" after Plunkett slammed a door while Plaintiff was training another employee.[140]

Plaintiff also contends Plunkett never complained about Plaintiff's "rudeness" until her deposition. Plaintiff points to Plunkett's testimony that she did not document or report the instances when her Airline co-workers allegedly complained about her rudeness.[141] Plaintiff also claims that she was suspended without any opportunity to defend herself.[142] Plaintiff maintains that Brown made the decision to suspend her.[143]

Plaintiff also claims that her co-workers engaged in the same general behavior of which she was accused, but they were not disciplined as harshly as she. Specifically, Plaintiff points to the fact that Plunkett admittedly cursed at Plaintiff during a work

---

[137] *Id.* at 294, 296, 301.
[138] *Id.* at 297, 302; Rec. Doc. No. 27-21.
[139] Rec. Doc. No. 27-5, Wells Depo. at 203-207, 214-216.
[140] Rec. Doc. No. 29-3, Bracken Depo. at 290-291.
[141] Rec. Doc. No. 29-4, Plunkett Depo. at 55-58.
[142] Rec. Doc. No. 29-3, Bracken Depo. at 296-301, 448, 467-468. Plaintiff also claims Abadie told her he did not want to write her up, and she cites to her deposition testimony at pp. 496-497. Rec. Doc. No. 29-1, p. 12. These pages were not submitted by Plaintiff as an exhibit, and the Court cannot verify support for this claim.
[143] Plaintiff cites Exhibit 62 to Brown's Depo. in support of this assertion; this exhibit does not appear in Plaintiff's submitted exhibits.

exchange, but Plaintiff contends Plunkett was not disciplined for this or other similar conduct.[144]

Plaintiff makes the unsupported claim that she met with Wells and Hickerson on October 31, 2018 and "conveyed to them that she was being harassed."[145]

Defendant counters Plaintiff's assertions, citing Plunkett's testimony that she discussed Plaintiff's attitude with Cupit and Abadie on two to three occasions.[146] Further, Plunkett testified that employees in the Recording Department, specifically Karen Pope and Kindra Patin, complained to her about Plaintiff's rude comments, being rude to customers, and being rude in general.[147] Defendant also contends Plaintiff did have an opportunity to defend herself as she wrote her version of events on the corrective action and submitted two rebuttal letters.[148] Defendant disputes that Plunkett was not disciplined for using a curse word in a conversation with Plaintiff; the record demonstrates that Plunkett was given a verbal counseling by Abadie, and Plunkett immediately apologized to Plaintiff.[149]

Defendant acknowledges that Plunkett and Plaintiff dispute the exact wording of the comment that gave rise to the October 2018 corrective action; however, Defendant maintains that, in either scenario, Plunkett did not take the comment as joking but as insubordinate.[150] Also, Defendant admits that Brown ultimately approved Plaintiff's suspension after the fact,[151] but Defendant maintains that Abadie made the decision to

---

[144] *Id*. at 293-295, 484; Rec. Doc. No. 29-4, Plunkett Depo. at 90-95, 209-211.
[145] Rec. Doc. No. 29-1, p. 14. The citation to Bracken's Depo., pp. 305-306 does not support this assertion, and p. 315 was not submitted in Plaintiff's exhibits.
[146] Rec. Doc. No. 27-6, Plunkett Depo. at 49-50, 54-55; 59, 61, 108.
[147] *Id*. at 55-58.
[148] Rec. Doc. No. 27-2, Bracken Depo. at 287-290; Rec. Doc. No. 27-19; Rec. Doc. No. 27-21.
[149] Rec. Doc. No. 27-6, Plunkett Depo. at 89-90, 93, 96.
[150] *Id*. at 44-47, 213-214; Rec. Doc. No. 27-19.
[151] Rec. Doc. No. 27-3, Brown Depo. at 107; Rec. Doc. No. 35-2, Wells Depo. at 190-192.

suspend Plaintiff without consulting Brown.[152]

## F. November 13, 2018 Final Written Warning and Separation

On Tuesday, November 13, 2018, Brown, Wells, Abadie, Plunkett, and Cupit met with Plaintiff[153] to provide Plaintiff with a final warning, to "get on the same page," and to explain that they were not going to tolerate any more disruptions and the expectations for moving forward.[154] Defendant maintains there was no intent to terminate Plaintiff at this meeting.[155]  Brown began the meeting by presenting a final written warning letter to Plaintiff and asking her to read it.[156]  Plaintiff stated she "was not going to read the letter" and was "not going to sign anything."[157] Plaintiff accused Brown of being there to "harass" and "bother" her, she could "hashtag me too," Brown had watched her out of his window, she told Howard Burgess, and Brown sent Lands and Plunkett to have her written up.[158] Defendant admits Brown replied that it was not true no one would believe her.[159] Plaintiff then accused Abadie and Plunkett of wrongdoing.[160] Plaintiff pointed directly at Plunkett,

---

[152] Rec. Doc. No. 27-22, Abadie Declaration at ¶ 5; Rec. Doc. No. 27-6, Plunkett Depo. at 149, 158-159, 162-163, 171, 187; Rec. Doc. No. 35-2, Wells Depo. at 180-181, Vol. 2 at 59-60.

[153] Rec. Doc. No. 27-2, Bracken Depo. at 316, 318; Rec. Doc. No. 27-3, Brown Depo. at 102; Rec. Doc. No. 27-5, Wells Depo. at 224-225; Rec. Doc. No. 27-6, Plunkett Depo. at 61-62; Rec. Doc. No. 27-22, Abadie Declaration; Rec. Doc. No. 27-23, Cupit Declaration.

[154] Rec. Doc. No. 27-5, Wells Depo. at 220; Rec. Doc. No. 27-3, Brown Depo. at 102-103, 105; Rec. Doc. No. 27-22, Abadie Declaration.

[155] Rec. Doc. No. 27-5, Wells Depo. at 220.

[156] Rec. Doc. No. 27-2, Bracken Depo. at 318-319; Rec. Doc. No. 27-3, Brown Depo. at 103; Rec. Doc. No. 27-5, Wells Depo. at 225; Rec. Doc. No. 27-6, Plunkett Depo. at 64.

[157] *Id.* at 319; Rec. Doc. No. 27-3, Brown Depo. at 103, 214; Rec. Doc. No. 27-5, Wells Depo. at 225; Rec. Doc. No. 27-6, Plunkett Depo. at 64, 68, 76-87, 130; Rec. Doc. No. 27-22, Abadie Declaration; Rec. Doc. No. 27-23, Cupit Declaration; Rec. Doc. No. 27-24.

[158] Rec. Doc. No. 27-2, Bracken Depo. at 319, 442; Rec. Doc. No. 27-3, Brown Depo. at 114; Rec. Doc. No. 27-5, Wells Depo. at 48, 52-53, 65, 68, 225; Rec. Doc. No. 27-25; Rec. Doc. No. 27-6, Plunkett Depo. at 69-71, 203-204.

[159] *Id.* at 319; Rec. Doc. No. 27-3, Brown Depo. at 137, 199.

[160] *Id.* at 320, 322; Rec. Doc. No. 27-3, Brown Depo. at 114, 143; Rec. Doc. No. 27-5, Wells Depo. at 53, 227-228; Rec. Doc. No. 27-6, Plunkett Depo. at 68, 105-106; Rec. Doc. No. 27-22, Abadie Declaration; Rec. Doc. No. 27-24.

stating she had "a problem" with her and said that she was the "culprit."[161]   The meeting

became loud.[162] The witnesses described Plaintiff's behavior during his meeting as: "out

of control," "yelling," "unprofessional," "disruptive," "disrespectful," "hostile," and

"inappropriate."[163]

According to Plaintiff, Brown told her that she could either sign the letter or she

could leave.[164]   However, the supervisors present at the meeting reported that Plaintiff

stated she was resigning her employment.[165] Wells printed a resignation form (using the

Clerk's form), but Plaintiff refused to sign the form.[166]   Plaintiff clocked out, gathered her

belongings and left the office.[167]   Plaintiff disputes that she resigned on November 13th,

stating instead that she was "pushed out of the door."[168]   Defendant contends that, even

if she had not resigned, Wells would have recommended her termination due to her

conduct in the meeting.[169]

Subsequently, Plaintiff sent the Clerk's office a letter dated December 3, 2018,

regarding "wrongful termination."[170]   Plaintiff testified she was not seeking her job back;

---

[161] Rec. Doc. No. 27-5, Wells Depo. at 53, 225, 230; Rec. Doc. No. 27-6, Plunkett Depo. at  66, 68, 88-89, 97; Rec. Doc. No. 27-24.
[162] Rec. Doc. No. 27-5, Wells Depo. at 225-226; Rec. Doc. No. 27-6, Plunkett Depo. at 72, 108-109, 113.
[163] Rec. Doc. No. 27-3, Brown Depo. at 114, 214; Rec. Doc. No. 27-5, Wells Depo. at 49, 56, 207, 251; Rec. Doc. No. 27-23, Cupit Declaration; Rec. Doc. No. 27-6, Plunkett Depo. at 216-217.
[164] Rec. Doc. No. 27-2, Bracken Depo. at 321.
[165] Rec. Doc. No. 27-3, Brown Depo. at 102, 113-114, 136, 139, 193-195, 214; Rec. Doc. No. 27-5, Wells Depo. at 57, 228-229, 231-232, 251-252; Rec. Doc. No. 27-6, Plunkett Depo. at 134-135, 137; Rec. Doc. No. 27-22, Abadie Declaration.
[166] Rec. Doc. No. 27-2, Bracken Depo. at 326; Rec. Doc. No. 27-3, Brown Depo. at 138; Rec. Doc. No. 27-5, Wells Depo. at 231; Rec. Doc. No. 27-6, Plunkett Depo. at 137-141; Rec. Doc. No. 27-22, Abadie Declaration; Rec. Doc. No. 27-26.
[167] Rec. Doc. No. 27-2, Bracken Depo. at 321-322; Rec. Doc. No. 27-3, Brown Depo. at 142; Rec. Doc. No. 27-5, Wells Depo. at 231; Rec. Doc. No. 27-6, Plunkett Depo. at 183; Rec. Doc. No. 27-22, Abadie Declaration.
[168] Rec. Doc. No. 27-2, Bracken Depo. at 327.
[169] Rec. Doc. No. 27-5, Wells Depo. at 251-252.
[170] Rec. Doc. No. 27-2, Bracken Depo. at 344; Rec. Doc. No. 27-3, Brown Depo. at 123; Rec. Doc. No. 27-5, Wells Depo. at 40-41; Rec. Doc. No. 27-27.

Document Number: 67937                                                                                                   22

instead, she wanted payment of wages as a result of her suspension.[171] In response to this letter, the Clerk had the allegations investigated, but Plaintiff opted not to participate in the investigation.[172]

Plaintiff acknowledges this meeting took place but contends the final written warning was based on "false information" because the letter indicated she did not want to train a co-worker, and Plaintiff claims she had no problem training the co-worker and had no prior disagreements with other co-workers.[173]  Plaintiff stated during the meeting that she "could not take this anymore."[174]  Plaintiff denies that she ever stated that she wanted to resign, states that she did not get loud, and insists that she was terminated during this meeting.[175]  Plaintiff further contends that, following her termination, Brown made a statement to Plunkett:  "what took you so long to get rid of [Plaintiff]."[176]  Defendant acknowledges that Brown made this statement[177] but denies that it demonstrates retaliatory intent.  Brown admitted this was a "very inappropriate" statement and he was "wrong for making it,"[178] however Defendant notes that the statement was made after Plaintiff was already gone, and was made in jest as Plunkett did not terminate Plaintiff.[179]

On March 12, 2019, Plaintiff filed a Charge of Discrimination with the EEOC ("Charge") alleging discrimination based on race, sex, and retaliation between October

---

[171] *Id.* at 351-352.
[172] *Id.* at 361-364; Rec. Doc. No. 27-3, Brown Depo. at 115, 118; Rec. Doc. No. 27-5, Wells Depo. at 41, 43-44, 252-253.
[173] Rec. Doc. No. 29-3, Wells Depo. at 19-22, 22-23, 61-63, 71; Exhibit F to Wells Depo.  Plaintiff offers other statements that are unsupported by record citations and will not be considered by the Court.
[174] Rec. Doc. No. 29-4, Plunkett Depo. at 138-141; Rec. Doc. No. 29-3, Bracken Depo. at 318-327
[175] *Id.* at 321, 323-324, 461.
[176] *Id.* at 325.
[177] Rec. Doc. No. 27-3, Brown Depo. at 205; Rec. Doc. No. 27-6, Plunkett Depo. at 35-36.
[178] *Id.* at 206.
[179] *Id.* at 205, 206, 210, 212; Rec. Doc. No. 27-6, Plunkett Depo. at 38, 40, 41, 218.

24, 2018 and November 13, 2018.[180]  On November 19, 2019, the EEOC issued a dismissal and a "Notice of Right to sue." The EEOC issued a "no cause" determination stating, "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained established violations of the statutes… No finding is made as to any other issue that might be construed as having been raised by this charge."[181]  Plaintiff subsequently filed this lawsuit, alleging retaliation under Title VII of the Civil Rights Act of 1964.[182]

Defendant now moves for summary judgment on Plaintiff's claim, which Plaintiff has opposed.  Although Defendant initially moved for summary judgment on the issue of EEOC exhaustion, Defendant has abandoned that claim in its *Reply*,[183] thus the only issue before the Court is Plaintiff's Title VII retaliation claim.

## II.     LAW AND ANALYSIS

### A.  Summary Judgment

In reviewing a party's motion for summary judgment, the Court will grant the motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment as a matter of law.[184] This determination is made "in the light most favorable to the opposing party."[185] A party moving for summary judgment "'must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the

---

[180] Rec. Doc. No. 10-1, p. 2; *see* Rec. Doc. No. 12-1, p. 21.
[181] Rec. Doc. Nos. 1-1, ¶ 10; 10-1, p. 2.
[182] 42 U.S.C. § 2000e.
[183] Rec. Doc. No. 35 at 6, n. 38.
[184] FED. R. CIV. P. 56(a).
[185] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).

nonmovant's case.'"[186] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[187] However, the non-moving party's burden "'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[188]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[189] All reasonable factual inferences are drawn in favor of the nonmoving party.[190] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[191] "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiffs [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"[192]

---

[186] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

[187] *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[188] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).

[189] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[190] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).

[191] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

[192] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).

## B.     Retaliation

Plaintiff contends her termination was in retaliation for reporting the sexual harassment she suffered by Brown's alleged conduct.  To establish a *prima facie* case of retaliation under the traditional *McDonnell Douglas* framework, "the plaintiff must establish that: (1) [s]he participated in an activity protected by Title VII; (2) h[er] employer took an adverse employment action against h[er]; and (3) a causal connection exists between the protected activity and the adverse employment action."[193]   An employee engages in activity protected by Title VII when the employee has "opposed any practice made an unlawful employment practice" by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.[194]

If the plaintiff establishes a *prima facie* case, then the employer has the burden of production to provide "a legitimate, non-discriminatory reason" for the adverse employment action.[195]  If the employer meets this burden, then the plaintiff has the burden to prove that the proffered reason is pretextual.[196]  "A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence."[197]  Ultimately, in order to survive a motion for summary judgment, a plaintiff must show "a 'conflict in substantial evidence'" on the question of whether the

---

[193] *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).
[194] 42 U.S.C. § 2000e–3(a); *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).
[195] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004).
[196] *Id.*
[197] *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013).

employer would not have taken the adverse employment action but for the protected activity.[198]

## 1. Direct Evidence

Plaintiff contends that the following statements by Brown constitute direct evidence of retaliation such that summary judgment is not proper, and she is not required to demonstrate a *prima facie* case of retaliation under the *McDonnell Douglas* framework:

> (1) Ms. Bracken would not be transferred had she "[done] what [he] said" (in reference to his sexual advances), (2) Ms. Bracken had "big mouth" (in reference to her complaints), (3) Ms. Bracken would have been promoted but for her "mouth", (3) "what took you so long to get rid of" Ms. Bracken, (4) Ms. Bracken was "going to do what [Mr. Brown] said she was going to do", (5) "nobody would be [sic] believe" Ms. Bracken's complaints of sexual harassment, and (6) that Ms. Bracken was going to sign the retaliatory final written warning or "else". Hickerson's statement to Ms. Bracken that he and Mr. Fortune did not know why Mr. Brown "hated" her also demonstrates direct evidence of retaliation.[199]

Plaintiff relies on the decision of the Fifth Circuit in *Fabela v. Socorro Indep. Sch. Dist.*,[200] wherein the court held that an employer's statement during a termination meeting that the plaintiff was a "problem," and his reference to her filing an EEOC complaint years prior, constituted direct evidence of retaliation.[201]

Defendant counters that the statements attributed to Brown do not constitute direct evidence of retaliation because none of the statements refer to Plaintiff's engaging in protected activity opposing sexual harassment. Defendant argues:

> Tellingly, the only way Plaintiff can make even a plausible argument that these statements constitute direct evidence is by adding parenthetical or

---

[198] *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012)).

[199] Rec. Doc. No. 29 at 19.

[200] 329 F.3d 409 (5th Cir. 2003), *overruled on other grounds by Smith v. Xerox Corp.*, 602 F.3d 320, 330 (5th Cir. 2010)).

[201] *Id.* at 416-417.

bracketed statements, such as: (1) "Ms. Bracken would not have been transferred had she "[done] what [he] said" *[complied with his sexual advances]*; and, (2) "Ms. Bracken had a big mouth *(in reference to her complaints)*". The fact that Plaintiff added these parenthetical statements to "fill in" the inference of retaliatory motive demonstrates exactly why they cannot be deemed direct evidence: standing alone, the quotations do not refer to any protected activity or retaliatory motive.[202]

The Court agrees. Plaintiff's statements are only direct evidence if the bracketed statements were actually made by Brown rather than supplied as interpreted by Plaintiff's counsel. Indeed, without counsel's additional interpretive phrasing, the comments could easily reference the purported reason for Plaintiff's discipline – the manner in which she spoke to supervisors and co-workers, i.e., her "mouth." The statements offered, without Plaintiff's interpretive brackets, do not constitute direct evidence of retaliation. Further, the comment that Brown made to Plunkett after Plaintiff's termination – "what took you so long to get rid of her" – was made after Plaintiff's termination and, again, does not relate to Plaintiff's engagement in protected activity. The Court finds that Plaintiff has not presented direct evidence of retaliation; therefore, she must proceed under the traditional *McDonnell Douglas* burden-shifting framework.

## 2. Protected Activity

Defendant contends Plaintiff has not provided evidentiary support for her claim that she engaged in protected activity under Title VII. Defendant bases this argument on the fact that, even accepting as true all of Plaintiff's allegations relating to Brown's conduct towards her, such conduct did not rise to actionable harassment under the law. Defendant further contends that, even if Plaintiff subjectively believed, in good faith, that Brown had sexually harassed her, such a belief based on the nature of the conduct is

---

[202] Rec. Doc. No. 35 at 8-9 (original emphasis).

objectively unreasonable. Additionally, Defendant claims that stating to Burgess that Brown "approached her wrongfully" is too vague to constitute protected activity under Title VII.

Although the Court agrees with Defendant that Brown's alleged conduct does not rise to level of actionable harassment under Title VII under an objective reasonableness standard, the Court will give Plaintiff the benefit of the doubt, as the non-movant, and assume for the sake of this ruling that Plaintiff's report to Burgess in 2013 constituted Title VII protected activity. Indeed, the Fifth Circuit has repeatedly held that the opposition clause does not actually require the opposed conduct to, in fact, violate Title VII. Rather, it is "enough that [the plaintiff] reasonably believed the employment practice to be unlawful."[203]

However, the Court concludes that this is the only instance of protected activity supported by the record. Plaintiff claims she engaged in protected activity on September 19, 2017, in connection with the Airline transfer meeting; however, the record does not reflect that Plaintiff complained of Brown's alleged harassment during this meeting; Plaintiff's letters submitted October 26, 2018 and November 31, 2018 likewise contain no such complaints.[204] Outside of the 2013 reporting to Burgess, there is no record evidence of Plaintiff's alleged opposition to employment practices she perceived as unlawful.

The Court also finds that Plaintiff's comments directed at Brown during the final

---

[203] *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 240 (5th Cir. 2016)(citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1137–40 (5th Cir. 1981)); *see Cuellar v. Southwest General Emergency Physicians, P.L.L.C.*, 656 F. App'x 707, 710 (5th Cir. 2016) (per curiam) ("[A] viable Title VII retaliation claim does not necessarily depend on a viable harassment or discrimination claim." (emphasis omitted)). While the reasonable belief standard is "in tension with the plain text" of the statute, *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401 n.2 (5th Cir. 2013), it "remains good law." *Rite Way*, 819 F.3d at 240.
[204] Rec. Doc. Nos. 27-21 & 27-27-18, respectively.

warning meeting of 2018 do not constitute Title VII protected activity under the law and cannot form the basis of a retaliation claim. Defendant relies on the decision of the district court for the Southern District of Mississippi in *Burns v. Blackhawk Management Corp.*,[205] which the Court finds instructive here. In *Burns*, the plaintiff claimed he was terminated in retaliation for complaining about an alleged violation of the Fair Labor Standards Act. The defendant employer argued that the plaintiff was not fired for complaining about this alleged violation but for the "unreasonable manner in which [he] complained."[206] The court set forth the applicable Fifth Circuit guidance for such an argument:

> In the analogous context of Title VII retaliation jurisprudence, the Fifth Circuit has recognized that while an employee has the right to oppose an employer's unlawful employment practices, "not all 'opposition' activity is protected," *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir.1980), and that "some conduct, even if in sincere opposition to unlawful employment practices ..., may be so disruptive or inappropriate as to fall outside the protections" of the act, be it Title VII or the FLSA, *see Jones v. Flagship Intern.*, 793 F.2d 714, 728 (5th Cir.1986). *See also Rosser v. Laborers' International Union, Local 438*, 616 F.2d 221, 223 (5th Cir.), cert. denied, 449 U.S. 886, 101 S.Ct. 241, 66 L.Ed.2d 112 (1980) ("There may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed. In such a case, his conduct, or form of opposition, is not covered by § 704(a)."). "In determining whether particular conduct constitutes [protected] activity ..., this circuit has required a balancing test: '[T]he courts have required that the employee conduct be reasonable in light of the circumstances, and have held that "the employer's right to run his business must be balanced against the rights of the employee to express his grievances and promote his own welfare".'" *Jones*, 793 F.2d at 728 (quoting Jefferies, 615 F.2d at 1036); *see also Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1145 (5th Cir.1981) ("Courts have required that the employee's conduct be reasonable in light of the circumstances and that the conduct not be unjustifiably detrimental to the employer's interests."). "**If, under this balancing test, the manner in which the employee complains is found to be unreasonable, it falls outside the protection of the statute; the employee's conduct then may**

**be deemed an independent, legitimate basis for [the adverse employment action].**" *Rollins v. State of Florida Dept. of Law Enforcement*, 868 F.2d 397, 401 (11th Cir.1989); *see also Payne*, 654 F.2d at 1142 ("If the defendant took an adverse employment action against the plaintiff because of opposition conduct by the plaintiff that was outside the protection of the statute, then the defendant may have had a legitimate, nondiscriminatory reason to justify its actions."); *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 229 (1st Cir.1976) ("Certain conduct for example, illegal acts of opposition or unreasonably hostile or aggressive conduct may provide a legitimate, independent, and nondiscriminatory basis for an employee's discharge.").[207]

Applying this balancing test, "in determining whether an employee's conduct went 'too far'" courts must apply a rule of reason, taking into consideration both the purpose of the Act to protect persons reasonably engaging in opposition activity and the employer's interests and 'management prerogatives.'"[208] Relying on the Fifth Circuit's decision in *Payne*, the *Burns* court found that the plaintiff offered no evidence to demonstrate that "his activities were reasonable under the circumstances and were warranted by the employer's conduct."[209] Citing *Hochstadt*, the court noted that the plaintiff is only protected "from discharge for filing complaints in good faith before appropriate federal and state agencies and '*for registering grievances through channels appropriate in the particular employment setting*.'"[210]

Viewing the current record in the light most favorable to Plaintiff, and balancing the relevant factors set forth above, the Court concludes that Plaintiff's comments directed at Brown during the final warning meeting are not protected opposition activity based on the manner of Plaintiff's complaint and in light of the context of the professional setting and

---

[207] *Id.* at 433-434 (emphasis added).
[208] *Id.* at 434 (quoting *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 232 (1st Cir.1976)).
[209] *Id.* at 435 (citing *Payne*, 654 F.2d at 1145).
[210] *Id.* at 436 (quoting *Hochstadt*, 545 F.2d at 230–31)(emphasis in *Burns*).

purpose of the meeting.  Plaintiff does not even attempt to argue that such statements made in the context of this meeting complied with the discrimination reporting policy provided for in the Clerk's Employee Handbook, or were otherwise made "through channels appropriate in the particular employment setting."[211] Plaintiff fails to provide the Court with any jurisprudential authority that would support the reasonableness of claiming these comments constituted protected activity. Accordingly, the Court concludes that the only protected opposition activity in this matter occurred in 2013, when Plaintiff complained to Burgess about Brown's alleged harassing behavior.

### 3.  Adverse Employment Action/Retaliatory Harassment

Plaintiff must next demonstrate that an adverse employment action occurred. There is conflicting record evidence regarding whether Plaintiff stated her intent to resign during the final warning meeting; however, it is undisputed that Plaintiff was suspended in 2018, and the Court will assume for purposes of this motion that Plaintiff was terminated by Defendant thereafter.  However, Plaintiff contends the continuing violations doctrine applies to her so-called claim of retaliatory harassment.  Under this theory, Plaintiff maintains that every act of discipline and her transfer - which Defendant contends are time-barred, discrete acts - also constitute an ostensible pattern of retaliation.  The Court rejects this argument.

Very recently, in *Santos v. Baton Rouge Water Works Company*, another section of this Court succinctly explained that "[t]he Fifth Circuit has held that the continuing violations doctrine does not apply to claims of retaliation because 'retaliation is, by

---

[211] *Id.*

definition, a discrete act, not a pattern of behavior.'"[212]  In *Montgomery-Smith v. George*, the Fifth Circuit noted that: "In *Morgan*, the Supreme Court drew a distinction between allegation of discrete acts, such as retaliation, and allegations of racial discrimination. Actions taken over a long period of time may ultimately, in the aggregate, constitute racial discrimination. That is not the case with a discrete act of retaliation. [The plaintiff] cannot use a statement made in 2007 to create a fact question as to whether a failure to promote her years later was retaliatory."[213]  Moreover, Title VII does not cover "every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."[214] Allegations of unpleasant work meetings and verbal reprimands do not constitute actionable adverse employment actions.[215]  Thus, the only adverse employment actions properly before the Court are Plaintiff's 2018 suspension and ostensible termination.

### 4. Causal Connection

If the protected activity and the adverse employment action are "very close" in time, that alone may establish a *prima facie* causal link.[216] However, "even at the prima facie stage, temporal proximity can only establish a causal link when it is connected to the

---

[212] 2021 WL 1227878 at *14 (M.D. La. Mar. 31, 2021)(quoting *Hamic v. Harris Cnty., W.C. & I.D. No. 36*, 184 F. App'x 442, 447 (5th Cir. 2006); *Heath v. Bd. of Sup'rs for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 741 (5th Cir. 2017), *as revised* (Mar. 13, 2017)).
[213] 810 Fed. Appx. 252, 261 (5th Cir. 2020)(citing *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002)).
[214] *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003).
[215] *King v. Louisiana*, 294 Fed.Appx. 77, 85 (5th Cir. 2008)(citing *Burlington Northern*, 548 U.S. at 68); *see also Liddell v. Northrop Gumman Shipbuilding, Inc.*, 836 F. Supp. 2d 443, 457 (S.D. Miss. 2011) (disciplinary slip placed in personnel file that did not result in any type of reduced wages, terminations, or layoffs, or any other ultimate employment action are not actionable under Title VII).
[216] *See Thompson v. Somervell Cty.*, 431 F. App'x 338, 342 (5th Cir. 2011) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)) (per curiam).

decision maker's knowledge of the protected activity."[217]  Plaintiff fails to demonstrate close temporal proximity as the record demonstrates that her alleged protected activity occurred years before she ever received any form of discipline or corrective action.

Nevertheless, "an absence of tight temporal proximity does not doom a retaliation claim where there is other evidence of a causal link."[218] Even so, Plaintiff is unable to demonstrate a causal connection between her protected activity in 2013 and her 2018 suspension/termination.  There is no summary judgment evidence that, "but for" Plaintiff's report of sexual harassment to Burgess back in 2013, she would not have been suspended and/or terminated in 2018.   Plaintiff has offered no summary judgment evidence – only her own speculation and conjecture – to support a causal link between Defendant's knowledge of her protected activity and her 2018 suspension and termination.   Accordingly, Plaintiff has failed to present a *prima facie*  case of retaliation, and Defendant is entitled to summary judgment.

5. Pretext

Even if Plaintiff could present a prima facie case of retaliation, Plaintiff fails to demonstrate a genuinely disputed material fact issue as to whether the Defendant's legitimate, non-discriminatory reasons for her termination are a pretext for retaliation.  A plaintiff must "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination."[219]  "A plaintiff may show pretext

---

[217] *Id.* (citing *Breeden*, 532 U.S. at 273, 121 S.Ct. 1508; *Cothran v. Potter*, 398 F. App'x 71, 73–74 (5th Cir. 2010) ("The combination of temporal proximity and knowledge of a protected activity may be sufficient to satisfy a plaintiff's prima facie burden for a retaliation claim[.]"); *Ramirez v. Gonzales*, 225 F. App'x 203, 210 (5th Cir. 2007) ("Fifth Circuit precedent requires evidence of knowledge of the protected activity on the part of the decision maker and temporal proximity between the protected activity and the adverse employment action.")).

[218] *Saketkoo v. Tulane University School of Medicine*, --- F. Supp.3d ---, 2020 WL 7861308, at *16 (E.D. La. 2020).

[219] *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015).

either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence."[220] "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action."[221] Critically, "[w]hen conducting a pretext analysis, the court is not to engage in second-guessing an employer's business decisions.[222] Anti-discrimination laws do not require an employer to make proper decisions, only [non-discriminatory] ones."[223]

Defendant has easily met his burden of demonstrating a legitimate, non-discriminatory reason for Plaintiff's suspension and termination. The record is replete with uncontroverted evidence that several of Plaintiff's co-workers and supervisors found Plaintiff's tone and attitude in her office interactions unprofessional. Such conduct has been repeatedly held to constitute a legitimate, non-discriminatory reason for an adverse employment action.[224]

Plaintiff also challenges the veracity of Defendant's legitimate, non-discriminatory reasons for her 2018 suspension and termination, referring to these reasons repeatedly

---

[220] *Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010).

[221] *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017).

[222] *Culbert v. Cleco Corp.*, 926 F.Supp.2d 886, 894 (citing *LeMaire v. La. Dept. Of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir.2007)).

[223] *Id.* (citing *LeMaire*, 480 F.3d at 391 (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir.1991))).

[224] *Farmer v. Turn Key Installation, L.L.C.*, 812 Fed. Appx. 200, 203 (5th Cir. 2020) (dismissing retaliation claim due to plaintiff's bad attitude, telling, aggressiveness toward coworkers, and insubordination); *Burrell v. Dr. Pepper/ Seven Up Bottling Group*, 482 F.3d 408, 416 (5th Cir. 2007)(dismissing retaliation claim finding plaintiff made clear his lack of respect for his supervisor's authority, asserted no responsibility for their bad relationship, and made no provisions for future changes); *Smith v. Baton Rouge Radiology Group*, No. 12-400-SDD-RLB, 2013 WL 4782142, at * 4 (M.D. La. Sept. 5, 2013) (dismissing retaliation claim finding plaintiff's disciplinary record showed a history of violations and during the final counseling sessions, plaintiff was rude, confrontational and insubordinate); *Raby v. Westside Transit*, 2006 WL 1877000, at * 5 (E.D. La. June 16, 2006) (dismissing retaliation claim as employer had a legitimate reason to discharge plaintiff who had a "bossy attitude" and was "unpleasant to work around"); *Carballo v. Log Cabin Smokehouse*, 399 F.Supp.2d 715, 724 (M.D. La. 2005) (finding that an employee's history of emotional outbursts and a poor attitude were legitimate, non-retaliatory reasons for her firing); *Montgomery v. Coca-Cola Enterprises, Inc.*, No. 3:00-CV-2278, 2003 WL 138087, at *8 (N.D. Tex. Jan. 14, 2003) ("To the extent Defendant based its decision . . . on Plaintiff's inability to conduct herself in a professional manner with respect to co-workers, it is clear that such a rationale constitutes a legitimate, non-discriminatory reason for terminating her employment.").

as "false," and "fraudulent." Plaintiff has offered no summary judgment evidence beyond mere speculation and unsupported accusations of falsity. Jagneaux, Hickerson, Abadie, Plunkett, and Cupit all testified or attested that Plaintiff had a history of exhibiting an unprofessional work attitude. There is no evidence before the Court challenging that each of these supervisors believed that Plaintiff had violated office policy, and she was disciplined or issued corrective actions by each of their own accord. Plaintiff's disagreement with these opinions does not controvert the fact that multiple co-workers and supervisors, indeed, held such opinions.

Plaintiff relies heavily on her performance evaluations wherein she received good reviews for the quality of her work. Plaintiff repeatedly points to the generally good performance evaluations written by her supervisors and argues that these evaluations undermine the credence of the testimony that she was a problem employee. However, as explained by several of her supervisors in sworn testimony, Plaintiff did perform the functions of her job well; her attitude and tone were the problematic issues. These are not mutually exclusive facts, and Plaintiff's attitude problem was, in fact, documented on one of these performance evaluations.[225]

Plaintiff claims that Hickerson disregarded Arceneaux's statement and opinion that Plaintiff was not at fault in one of the disputes with Lands and disciplined Plaintiff anyway. However, Hickerson explained that he took Arceneaux's statement into account but determined Plaintiff's fault based on all of the statements given. Importantly, the Fifth Circuit has stated that "[t]he existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself

---

[225] Rec. Doc. No. 27-33.
Document Number: 67937

make reasonable an inference that the defendant was not truly motivated by its proffered justification."[226] Similarly, "[m]anagement does not have to make proper decisions, only non-discriminatory ones."[227]

Thus, Plaintiff's general denials that she was ever rude or unprofessional or at fault in any workplace interaction are insufficient to demonstrate pretext. Plaintiff's subjective belief, no matter how sincere, simply cannot support a finding that her protected activity from 2013 was the but-for cause of her suspension and termination in 2018.[228] Plaintiff has failed to present evidence that Defendant's reasons for her suspension and termination were false; after reviewing the record in this case, the Court concludes that no rational factfinder could concluded that Plaintiff was suspended and terminated because she reported alleged sexual harassment by Brown.

Finally, Plaintiff makes a fleeting disparate treatment argument, claiming that Plunkett received lesser discipline for engaging in unprofessional office conduct. However, as Plaintiff's supervisor, Plunkett is not Plaintiff's comparator. To show that a similarly situated employee was treated differently and that the difference in treatment is a pretext for discrimination, the conduct at issue must be "nearly identical."[229] Courts within the Fifth Circuit define "similarly situated" narrowly.[230] In evaluating whether an alleged comparator is similarly situated,

> "The employment actions being compared will be deemed to have been taken under **nearly identical circumstances** when the employees being

---

[226] *Little v. Republic Refining Co., Ltd.*, 924 F.3d 93, 97 (5th Cir. 1991).

[227] *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005).

[228] *Smith v. Board of Supervisors of Southern University*, 656 Fed. Appx. 30, 34 (5th Cir. 2016)(citing *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir. 1995) and *Waggoner v. City of Garland*, 987 F.2d 1160, 1164 (5th Cir. 1993)).

[229] *Moore v. Angus Chemical Co.*, 2008 WL 4491592 at *5 (W.D. La. Oct. 1, 2008)(citations omitted).

[230] *See Horton v. G4S Secure Solutions (USA), Inc.*, No. 16-544-SDD-EWD, 2018 WL 1997535 at *5 (M.D. La Apr. 27, 2018)(citing *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 871 F.Supp.2d 581, 593 (S.D. Tex. 2012); *see also Lopez v. Kempthorne,* 684 F. Supp. 2d 827, 856-57 (S.D. Tex. 2010)).

compared held the **same job or responsibilities**, **shared the same supervisor** [,] or had their **employment status determined by the same person**[.]"[231] "Employees with different supervisors, who work for different divisions of a company ... generally will not be deemed similarly situated."[232] The Fifth Circuit has further explained, that "employees who have different work responsibilities ... are not similarly situated."[233]

Plaintiff has failed to identify a proper comparator to support a disparate treatment argument.

Defendant is entitled to summary judgment in this case.

## III.     CONCLUSION

For the foregoing reasons, Defendant's *Motion for Summary Judgment*[234] is GRANTED.    Judgment shall be entered accordingly.

The Final Pre-Trial Conference, set for July 20, 2021, and the Jury Trial, set to begin August 2, 2021, are hereby cancelled.    All pending motions in this matter are DENIED as MOOT and shall be terminated by the Clerk of Court's Office.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 14th day of July, 2021.

_Shelly D. Dick_
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[231] *Horton*, 2018 WL 1997535 at *5 (quoting *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012)(quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009))).
[232] *Id.* (quoting *Lee*, 574 F.3d at 259 (citing *Wyvill v. United Cos. Life Ins.*, 212 F.3d 296, 302 (5th Cir. 2000))(emphasis added).
[233] *Id.* (quoting *Lee*, 574 F.3d at 259-260 (citing *Smith v. Walmart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990)).

[234] Rec. Doc. No. 27.